**KORNHASS CONSTRUCTION, INC.; T.A.O., Inc.; and DACO Construction Company, Plaintiffs,**

v.

**STATE OF OKLAHOMA, DEPARTMENT OF CENTRAL SERVICES, Defendant.**

**No. CIV–99–1106–R.**

United States District Court,
W.D. Oklahoma.

Feb. 9, 2001.

James M. Peters, Monnet Hayes Bullis Thompson & Edwards, Edward L. White, Edward L. White P.C., Oklahoma City, for Kornhaas Construction Inc., TAO Inc, DACO Construction Company, Oklahoma Corporations, on Their own Behalf and as Class Representatives, plaintiffs.

Lisa Tipping Davis, Office of Attorney General, Melvin C. Hall, Riggs Abney Neal Turpen Orbison & Lewis, Oklahoma City, for Oklahoma State . of, Oklahoma Department of Central Services, Pamela M. Warren, In Her Official Capacity as Director of DCS, and/or Her Predecessors and Successors, Southeastern Oklahoma State University, Glen D. Johnston, In His Official Capacity as President of Southeastern, and/or His Predecessors and Successors, Oklahoma Department of Corrections, James L. Saffle, In His Official Capacity as Director of Corrections, and/or His Predecessors and Successors, OK Black Caucus FDN, Oklahoma Consortium FO Minority Business Development Inc, defendants.

### *ORDER*

RUSSELL, Chief Judge.

Before the Court is the Plaintiffs' Motion for Partial Summary Judgment. The Plaintiffs move the Court for partial summary judgment declaring Oklahoma's Minority Business Enterprise Assistance Act to be unconstitutional.

### I. *Summary of the Evidence.*

The Oklahoma Minority Business Enterprise Assistance Act, Title 74 Okla. Stat. § 85.45 *et seq.*, ("the Act") establishes a bid preference program by which "certified minority business enterprises" are given favorable treatment on competitive bids submitted to the state pursuant to the Oklahoma Central Purchasing Act or the Public Competitive Bidding Act of 1974.[1] In effect, under the Act, the bids of non-minority contractors [2] are raised by five percent, placing them at a competitive dis-

---

1. The Act provides:
 "The program shall require that a percentage be added to the price of the lowest bid and if the certified minority business enterprise submits a bid that falls between the lowest bid and the percentage, it shall receive the contract."
 Title 74 Okla. Stat. § 85.45c (A). According to the State, only construction projects, under the Construction and Properties Division of the Oklahoma Department of Central Services, are directly at issue in this case. (State's brief, p. 3).

2. Technically it would be more accurate to say that the bids of *non-certified* contractors are raised by five percent. Under the Act, the

preference is afforded only to those contractors who are certified by the State Purchasing Director as "minority business enterprises" under Title 74 Okla. Stat. § 85.45e. To obtain certification, an entity must: 1) meet the statutory definition of a minority business enterprise, 2) submit any documentary evidence required by the rules and regulations of the Office of Public Affairs to support its status, 3) sign an affidavit stating that it is a minority business enterprise, and 4) be qualified to bid pursuant to the Oklahoma Central Purchasing Act. Moreover, according to the Defendants' evidence, certified minority businesses are subject to periodic site visits to ensure that they are still eligible for certification.

advantage.[3] In order to benefit from the Act's bidding preference, a business must apply for minority certification and meet the statutory terms and definitions. The term "minority" is defined as a person who is a lawful resident of the State of Oklahoma and is either Black, Hispanic, Asian American, American Indian or Alaskan Native. The term "minority business enterprise" is defined to mean "a small business concern" as defined by Section 3 of the Small Business Act, "which is owned and controlled by one or more minorities." Id.

Each fiscal year, the state purchasing director is required to certify the percentage of funds expended on state contracts which have been awarded to minority business enterprises. When the state purchasing director certifies that a minimum of ten percent of the funds expended on state contracts are expended on contracts awarded to minority business enterprises, the percentage bid preference will be phased out.[4] "Minority" is defined in the Act as a person who is a lawful resident of the State of Oklahoma and who is Black,[5] Hispanic, Asian American, American Indian or Alaskan native.[6] A "minority business enterprise" is defined as a small business concern which is at least fifty-one percent owned by one or more minorities, and whose management and daily business operations are controlled by one or more minority individuals. The Act requires a minority-owned business to comply with a fairly detailed procedure in order to become certified to bid as a "minority business enterprise."[7]

3. See Title 74 Okla. Stat. § 85.45c (B).

4. The Act provides:

"1. For the 1988—1989 fiscal year, the State Purchasing Director shall certify the percent of funds expended on state contracts which have been awarded to minority business enterprises certified pursuant to Section 7 of this act. If the State Purchasing Director certifies that a minimum of ten percent (10%) of the funds expended on state contracts were expended on contracts awarded to minority business enterprises pursuant to Section 7 of this act then the minority percentage bid preference shall be zero. If the percentage of such funds expended on minority business enterprises is less than ten percent (10%) then a five percent (5%) bid preference shall go into effect; and

2. For each following fiscal year, the State Purchasing Director shall certify the percent of funds expended on state contracts which have been awarded to minority business enterprises. When the State Purchasing Director certifies that a minimum of ten percent (10%) of the funds expended on state contracts are expended on contracts awarded to minority business enterprises then the percentage bid preference shall remain at that preference level for a period of one year. After that one-year period, unless the minority bid preference level is zero, the State Purchasing Director shall reduce by one percent (1%) each year the bid preference level unless the required percent of funds expended on state contracts awarded to minority business enterprises decreases below the ten percent (10%) minimum. At that time, the State Purchasing Director shall increase the percentage bid preference one percent (1%) each year to a maximum of five percent (5%) to attain the minimum ten percent (10%) goal of the program. Each year the State Purchasing Director may increase or decrease the bid percentage level in compliance with this section to maintain the minimum ten percent (10%) goal of the program."

Title 74 Okla. Stat. § 85.45c.

5. "Black" is defined in the Act as a person having origins in any of the black racial groups of Africa. 74 Okla. Stat. § 85.45b.

6. See Title 74 Okla. Stat. § 85.45b.

7. Title 74 Okla. Stat. § 85.45e provides, in pertinent part:

"B. The State Purchasing Director shall certify a business which meets the eligibility requirement of this section to qualify as a minority business enterprise. To qualify as a minority business enterprise, the business shall:

1. be a minority business enterprise;

2. submit any documentary evidence required by the rules and regulations of the

When it adopted the Act in 1987, the Oklahoma Legislature included a statement that the purpose of the Act was to "ensure that minority business enterprises are not underrepresented in the area of procurement of state contracts for construction, services, equipment and goods," and to provide "aggressive solicitation of minority business enterprises." Title 74 Okla. Stat. § 85.45a.[8] The Act applies to state contracts awarded pursuant to both the Oklahoma Central Purchasing Act and the Public Competitive Bidding Act of 1974.

The named Plaintiffs are non-minority business enterprises who submitted bids for state contracts governed by the Act. In keeping with the Act's bid preference provision, the Plaintiffs' bids were increased by five percent. Thus, although the Plaintiffs actually submitted the lowest bids, once the five percent factor was applied, minority bidders became the successful bidders. The Plaintiffs allege that in some instances, they submitted bids lower than they otherwise would have because they believed that minority businesses were also planning to bid.

## II. *Standard of Review.*

The Plaintiffs bring suit challenging the Act, arguing that the Act's racial bidding preferences violate the Equal Protection Clause by discriminating on the basis of race. Like most affirmative action programs, the Act establishes racial categories, and extends benefits to members of the preferred racial groups.

The Court is guided in its analysis by the Tenth Circuit's recent holdings in *Adarand Constructors, Inc. v. Slater*, 228

---

Office of Public Affairs to support its status as a minority business enterprise;

3. sign an affidavit stating that it is a minority business enterprise;

4. be qualified to bid pursuant to the provisions of the Oklahoma Central Purchasing Act;

5. present:

a. an application including the entire business history of the operation;

b. birth certificates for all minority principals;

c. if Native American, tribal registration card/certificate;

d. current resumes on all principals, key managers and other key personnel;

e. a current financial statement;

f. proof of investment by principals;

g. loan agreements;

h. lease/rental agreement for space. equipment;

i. evidence of latest bond;

j. if the applicant is a sole proprietor, he shall include: a copy of a blank signature card;

k. if the applicant is a partnership a copy of the partnership agreement shall also be included, and

l. if the applicant is a corporation it shall also include: articles of organization, corporation bylaws, copies of all stock certificates, minutes of the first corporate organizational meeting, bank resolution on all company accounts, and a copy of the latest U.S. corporate tax return."

8. The Oklahoma Minority Business Enterprise Assistance Act includes the following statement of legislative intent:

"85.45a. Legislative intent.
It is recognized by this state that the preservation and expansion of the American economic system of private enterprise is through free competition, but it is also recognized that the security and well-being brought about by such competition cannot be realized unless the actual and potential capacity of minority business enterprises is encouraged and developed. Therefore, it is the intent of the Legislature that the state ensure that minority business enterprises are not underrepresented in the area of procurement of state contracts for construction, services, equipment and goods. It is further the intent that this state provide for the aggressive solicitation of minority business enterprises, provide a feasibility study on a Small Business Surety Bond Guaranty Program, provide other programs targeted for assisting minority business enterprises in qualifying for state bids, and establish a percentage preference bid program for minority business enterprises who desire to participate in such program."

F.3d 1147 (10th Cir.2000) ("*Adarand VII*").[9] In *Adarand VII,* the Tenth Circuit found compelling evidence of barriers to both minority business formation and existing minority businesses. First, the evidence showed that prime contractors in the construction industry had often refused to employ minority subcontractors due to what the court termed "old boy" networks, based upon a familial history of participation in the subcontracting market, from which minority firms have traditionally been excluded. *Adarand VII, supra.* The court found further that sub-contractors' unions place before minority firms a plethora of barriers to membership, thereby effectively blocking them from participation in a subcontracting market in which union membership is an important condition for success. The court found that the government's evidence was particularly striking in the area of race-based denial of access to capital. The court emphasized that the Government's evidence "strongly supports the thesis that informal, racially exclusionary business networks dominate the subcontracting construction industry, shutting

---

**9.** A discussion of *Adarand Constructors, supra,* requires a brief review of its storied history. In *Adarand,* the United States Department of Transportation awarded the prime contract for a highway construction project in Colorado to Mountain Gravel & Construction Company. Mountain Gravel, as prime contractor, then solicited bids from subcontractors for the guardrail portion of the contract. Although Adarand Constructors submitted the low bid, the guardrail subcontract was awarded to Gonzales Construction Company, a certified small business owned and controlled by socially and economically disadvantaged individuals. Mountain Gravel's contract included a "Subcontractor Compensation Clause" ("SCC"), under which Mountain Gravel received additional compensation for hiring a certified subcontractor. Adarand brought suit challenging the SCC, arguing that the use of a race-conscious presumption in determining which business owners were socially and economically disadvantaged for purposes of the SCC violated its Fifth Amendment Equal Protection rights. The district court upheld as constitutional, under intermediate scrutiny, the statutory provisions defining disadvantaged business enterprises and setting goals for participation by disadvantaged businesses in government contracting. *See Adarand Constructors, Inc. v. Skinner,* 790 F.Supp. 240 (D.Colo.1992) ("*Adarand I*"). The Tenth Circuit affirmed the district court's judgment on different grounds, again applying intermediate scrutiny and holding that the SCC program was constitutional "because it [was] narrowly tailored to achieve its significant governmental purpose of providing subcontracting opportunities" for small, disadvantaged business enterprises. *Adarand Constructors, Inc. v. Pena.* 16 F.3d 1537, 1539 (10th Cir.1994) ("*Adarand II*"). The Supreme Court reversed, holding that strict scrutiny must be applied to federal programs involving racial classifications. *See Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) ("*Adarand III*"). On remand, the district court held the SCC program to be unconstitutional, finding it to be insufficiently narrowly tailored to further a compelling interest because the program was both over-and under-inclusive, including minority individuals who were not in fact disadvantaged, and excluding non-minority individuals who were disadvantaged. *See Adarand Constructors, Inc. v. Pena,* 965 F.Supp. 1556 (D.Colo.1997) ("*Adarand IV*"). The Tenth Circuit reversed, holding that because Adarand had applied for and received disadvantaged business certification by the Colorado Department of Transportation it could no longer demonstrate an injury stemming from the SCC sufficient to confer standing, and thus the case was moot. *See Adarand Constructors, Inc. v. Slater,* 169 F.3d 1292 (10th Cir.1999) ("*Adarand V*"). The Supreme Court reversed, holding that the possibility of a defendant engaging in or resuming harmful conduct might be too speculative to confer standing but not too speculative to overcome mootness. *Adarand Constructors, Inc. v. Slater,* 528 U.S. 216, 120 S.Ct. 722, 145 L.Ed.2d 650 (2000) ("*Adarand VI*"). The case was remanded to the Tenth Circuit, which held that the 1996 version of the SCC was not narrowly tailored and violated the Equal Protection Clause, but that the current program was narrowly tailored. *Adarand Constructors, Inc. v. Slater,* 228 F.3d 1147 (10th Cir.2000) ("*Adarand VII*").

out competition from minority firms." The Government also offered evidence showing that minority subcontractors often find themselves unable to compete with non-minority firms on an equal basis due to racial discrimination by bonding companies and suppliers. In sum, the court concluded that the Government had met its burden of presenting a strong basis in evidence sufficient to support its articulated, constitutionally valid, compelling interest. *Adarand VII,* 228 F.3d 1147, 1174.

The Tenth Circuit in *Adarand VII* found that the Government had not shown that the Federal Lands Highway Program adequately considered race-neutral alternative measures in the 1996 SCC program. However, the situation has since changed. The then-current, revised regulations instructed recipients that they must meet the maximum feasible portion of their goal by using race-neutral means of facilitating participation by disadvantaged businesses. 228 F.3d 1147, 1178—1179. The court noted that under the current statute and regulations, a particular company's disadvantaged status was limited to approximately ten and one-half years, whereas the 1996 regulations had no such time limitation.

 The Court's first task is to identify and apply the correct standard of review for the Act.[10] The Supreme Court has stressed that racial and ethnic distinctions of any sort are inherently suspect, and thus call for the most exacting level of judicial examination, referred to as "strict scrutiny." *Regents of the University of California v. Bakke,* 438 U.S. 265, 290, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). Strict scrutiny analysis, arising out of the Fourteenth Amendment's Equal Protection clause, requires the state to prove that its

purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is "necessary to the accomplishment of its purpose or the safeguarding of its interest." *Bakke,* 438 U.S. 265, 305, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). In keeping with these principles, a race-based affirmative action program will withstand strict scrutiny only if it is narrowly tailored to serve a compelling governmental interest. *Alexander v. Estepp,* 95 F.3d 312, 315 (4th Cir.1996); *Adarand VII,* 228 F.3d 1147 (10th Cir. 2000). In *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), the Supreme Court reaffirmed the "strict scrutiny" standard of review adopted by the Court for preferential programs based on racial or ethnic criteria in *Wygant v. Jackson Board of Education,* 476 U.S. 267, 274, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). Strict scrutiny requires that a minority preference program be "narrowly tailored" to satisfy a "compelling governmental interest." 476 U.S. at 274, 106 S.Ct. 1842, 90 L.Ed.2d 260. This standard applies to "all racial classifications imposed by whatever federal, state, or local governmental actor...." *Adarand III,* 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).

### A. Compelling State Interest.

 In applying the strict scrutiny standard, the Court must first identify precisely the compelling state interest that might overcome the strong presumption against racial classification. It is clear from Supreme Court precedent that there may be a compelling interest sufficient to justify race-conscious affirmative action measures. As Justice O'Connor explicitly stated in *Adarand III,* 515 U.S. at 237, 115

---

**10.** As the Tenth Circuit has pointed out, the Supreme Court's declarations in the area of affirmative action are characterized by plurality and split opinions, and by the overruling of precedent, thus complicating the task faced by lower courts in identifying and applying the correct standard of review. *Adarand VII,* 228 F.3d 1147, 1161 (10th Cir.2000).

S.Ct. 2097, 132 L.Ed.2d 158, the unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups is an unfortunate reality in this country, and our government is not disqualified from acting in response to it. Thus, the Fourteenth Amendment permits race-conscious programs that seek both to eradicate discrimination by the governmental entity itself and to prevent the governmental entity from becoming a "passive participant" in a system of racial exclusion practiced by private businesses. *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 498—506, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). It is clear, therefore, that both the federal and state governments have a compelling interest assuring that public dollars do not serve to finance the evil of private prejudice. *Croson,* 488 U.S. at 492, 109 S.Ct. 706, 102 L.Ed.2d 854; *Concrete Works of Colorado, Inc. v. City and County of Denver,* 36 F.3d 1513, 1519 (10th Cir.1994), *cert. denied,* 514 U.S. 1004, 115 S.Ct. 1315, 131 L.Ed.2d 196 (1995).

However, a mere statistical disparity in the proportion of contracts awarded to a particular group, standing alone, does not demonstrate the evil of private or public racial prejudice. *Associated General Contractors of Ohio, Inc. v. Drabik,* 214 F.3d 730, 734—735. The benchmark for judging the adequacy of a state's factual predicate for affirmative action legislation is whether there exists a strong basis in the evidence for the state's conclusion that remedial action was necessary. *Adarand III.* 228 F.3d at 1165; *Concrete Works of Colorado, Inc. v. City and County of Denver,* 36 F.3d 1513, 1520—1521; *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 500, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). To make the necessary showing, a state cannot rely upon mere speculation or pronouncement that discrimination occurred in the past. Rather, the Supreme Court has made it

clear that the state bears the burden of demonstrating a strong basis in evidence for its conclusion that remedial action was necessary by proving either that the state itself discriminated in the past or was a passive participant in private industry's discriminatory practices. *Associated General Contractors of Ohio, Inc. v. Drabik,* 214 F.3d 730, 735 (6th Cir.2000); *Croson,* 488 U.S. at 486—492, 500, 109 S.Ct. 706, 102 L.Ed.2d 854.

The Plaintiffs first assert that the Act is not supported by a compelling state interest. The State responds that its compelling state interest "is to promote the economy of the State and to ensure that minority business enterprises are given an opportunity to compete for state contracts." (State's response brief, p. 17). The State admits that the Act's bid preference "is not based on past discrimination," rather, it is based on a desire to "encourag[e] economic development of minority business enterprises which in turn will benefit the State of Oklahoma as a whole." (State's response brief, p. 17). The Act's published statement of legislative intent supports this explanation. In light of *Adarand VII* and prevailing Supreme Court case law, the Court finds that this articulated interest is not "compelling" in the absence of evidence of past or present racial discrimination.

The Defendant Intervenors assert that the Oklahoma legislature conducted an interim study prior to adoption of the Act, during which testimony and documentary evidence were presented to members of the Oklahoma Legislative Black Caucus and other participating legislators. The Intervenors offer none of this evidence in this proceeding, but explain that the interim study was conducted more than fourteen years ago, and that "apparently the testimony and documents presented during the interim study were not retained ...." (Intervenors' brief, pp. 14—15).

The Intervenors argue that by enacting the bid preference program, the legislature acted upon the evidence produced by the interim study, which found that discrimination existed both in the past and at the time of the study. (Intervenors' brief, p. 21).

The Intervenors have submitted an affidavit from Jessie Orange, who serves as the Title VI Coordinator for the Oklahoma Department of Transportation. Prior to his employment with the state, Mr. Orange owned Orange & Associates Construction Company. Mr. Orange states that he is African American, and that Orange & Associates was a one hundred percent minority-owned company. During the time he operated his construction company, Mr. Orange was actively involved with the Minority Contractors Association ("the Association"). In 1987, the Association had approximately 65 member businesses, most of which were African–American owned construction companies. (Intervenors' Exhibit "I," Jessie Orange Affidavit, p. 1). According to Mr. Orange, Association members were frustrated over not receiving contracts from the state through the competitive bidding process. In 1985, representatives of the Association began consulting with the Oklahoma Legislative Black Caucus, community organizations, the Ministerial Alliance, the Oklahoma Department of Transportation, the Oklahoma Department of Central Purchasing and the National Association for the Advancement of Colored People ("NAACP") to discuss how minority contractors could obtain contracts from the state. Mr. Orange avers that the Association "had in its possession information, statistics and case studies demonstrating that minorities were systematically excluded from doing business with the state of Oklahoma." (Orange affidavit, p. 2). Mr. Orange further states that the Association demanded and re-

ceived statistics from the state "which revealed that no African American construction company had received a construction contract from the state of Oklahoma." (Orange affidavit, p. 2). In 1997, the Oklahoma Legislative Black Caucus conducted an interim study into the possibility of introducing legislation to assist minority businesses in obtaining state contracts. Mr. Orange avers that during the interim study process, the Minority Contractors Association and other groups and citizens "presented information, documentation and evidence demonstrating that minorit[y] contractors had been systematically and discriminatorily excluded" from doing business with the State of Oklahoma. (Orange affidavit, pp. 2—3). According to Mr. Orange, the Oklahoma Legislature adopted the Oklahoma Minority Business Enterprises Assistance Act as a result of these efforts. (Orange affidavit, p. 3).

█ In summary, Mr. Orange's affidavit avers, in the most general terms, that minority businesses were discriminated against in the awarding of state contracts, and that the state legislature adopted the Act in response to evidence documenting such discrimination. The Intervenors allege that "evidence" of discrimination was presented to and relied upon by the legislature, but the Intervenors have not produced—or indeed even described—the evidence. It cannot be discerned from the Intervenors' exhibits or brief which minority businesses were the victims of such discrimination, or even which racial or ethnic groups were targeted by such discrimination. Nor does the Intervenors' evidence indicate what discriminatory acts or practices allegedly occurred, or when they occurred. The Intervenors have not identified a single qualified, minority-owned bidder who was excluded from a state contract.[11] The Intervenors' broad allega-

---

11. Mr. Orange's affidavit identifies his former business, Orange & Associates, as a construc-

tions of "systematic" exclusion of minority businesses are not sufficient to constitute a compelling government interest in remedying past or current discrimination. *See, e. g., Associated General Contractors of Ohio, Inc. v. Drabik,* 214 F.3d 730 (6th Cir.2000).[12] This is particularly true in light of the State's admission here that the State's governmental interest was not in remedying past discrimination in the state competitive bidding process, but in "encouraging economic development of minority business enterprises which in turn will benefit the State of Oklahoma as a whole." (State's brief, p. 17).

The Act's minority bidding preference is clearly not predicated upon a finding of discrimination in any particular industry or region of the state, or discrimination against any particular racial or ethnic group. The Act is broadly applicable to most state contracts for goods and services, and its bidding preference extends to all of the identified minority groups, including blacks, Hispanics, Asian Americans, Native Americans and Alaskan natives. Although the Intervenors have made some attempt to show a history of

discrimination against African Americans, neither the Intervenors nor the State have offered evidence of actual discrimination, past or present, against the other groups to whom the preference is extended. It thus appears that the Defendants[13] have not demonstrated that the Act is supported by the compelling state goal of providing relief to those particular business enterprises or racial groups who are the victims of past or present racial discrimination.

### B. *Narrow Tailoring.*

 Even if the State's articulated goals could be considered "compelling," the Defendants have not shown that the Act is narrowly tailored to serve those goals. The Tenth Circuit in *Adarand VII* identified the following factors the Court must consider in determining whether the Act's minority preference provisions are sufficiently narrowly tailored to satisfy equal protection are: 1) The availability of race-neutral alternative remedies; 2) limits on the duration of the challenged preference provisions; 3) flexibility of the preference provisions; 4) numerical proportional-

---

tion company wholly owned by an African American. However, Mr. Orange's affidavit does not identify any state contracts his company bid on: not does it attempt to show that his company was qualified to bid, or that his company's bid was lower than the successful bid for any particular contract. In fact, as the Plaintiffs allege, the Defendants have failed to produce any admissible evidence of a single, specific discriminatory act, or any substantial evidence showing a pattern of deliberate exclusion from state contracts of minority-owned businesses.

12. In *Drabik, supra,* the Sixth Circuit rejected Ohio's statistical evidence of underutilization of minority contractors because the evidence did not report the actual use of minority firms; rather, they reported only the use of those minority firms who had gone to the trouble of being certified and listed by the state. It appears that the evidence of histori-

cal underutilization of minority contractors presented by the Intervenors in this case suffers from the same infirmity. The statutory certification procedure in Oklahoma appears to be rather cumbersome. See Title 74 Okla. Stat. § 85.45 e, quoted in footnote 7 above. As in *Drabik,* the evidence presented in support of the Act fails to account for the possibility that some minority contractors might not register with the state. Nor do the Defendants' statistics account for any contracts awarded to businesses with minority ownership of less than fifty one percent, or for contracts performed in large part by minority-owned sub-contractors where the prime contractor was not a certified minority-owned business.

13. The Court's references to "the Defendants" are intended to include both the State and the intervening defendants.

ity; 5) the burden on third parties; and 6) over- or under-inclusiveness. *Adarand III, supra.*

 *Race Neutral Alternative Remedies.* First, the Court addresses the factor of whether the state considered race-neutral means to achieve the stated objective of encouraging minority business participation in state contracting. *See United States v. Paradise,* 480 U.S. 149, 171, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987); *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 507, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (The proponents of the race-conscious law bear the burden of showing that less restrictive alternatives were examined); *Engineering Contractors Association of South Florida v. Metropolitan Dade County,* 122 F.3d 895, 928—928 (11th Cir.1997), *cert. denied,* 523 U.S. 1004, 118 S.Ct. 1186, 140 L.Ed.2d 317 (1998).

Here the evidence offered by the State and the Intervenors shows, at most, that nominal efforts were made to assist minority-owned businesses prior to the adoption of the Act's racial preference program. First, the Intervenors offer the affidavit of Jessie Orange, which recites that prior to adoption of the Act, the State implemented a program entitled the Minority Assistance Program.[14] However, the Intervenors acknowledge that the Minority Assistance Program provided primarily informational services, and was not designed to actually assist minorities or other disadvantaged contractors to obtain contracts with the State of Oklahoma. (Affidavit of Jessie Orange, p. 2). In contrast to this "infor-

mational" program, the Tenth Circuit in *Adarand VII* favorably considered the federal government's use of racially neutral alternatives aimed at disadvantaged businesses, such as assistance with obtaining project bonds, assistance with securing capital financing, technical assistance, and other programs designed to assist start-up businesses. 228 F.3d at 1178—1179. *See also City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 510, 109 S.Ct. 706, 730, 102 L.Ed.2d 854 (1989) (Observing that the Defendant city had at its disposal a whole array of practical, race-neutral devices to increase the accessibility of city contracting opportunities to small entrepreneurs of all races, including simplification of bidding procedures, relaxation of bonding requirements, and training and financial aid for disadvantaged entrepreneurs of all races. These alternatives would open the public contracting market to all those who have suffered the effects of past societal discrimination or neglect). From the evidence of record, it does not appear that Oklahoma's Minority Assistance Program provided comparable relief, nor does it appear that the program was racially neutral. Indeed, it has not been shown that the State of Oklahoma provided any meaningful form of assistance to new or disadvantaged businesses prior to adoption of the Act.[15] The Court finds, accordingly, that the Defendants have not shown that Oklahoma considered race-neutral alternative means to achieve the State's goal prior to adoption of the minority bid preference provisions.

---

**14.** Mr. Orange's affidavit avers that the state "had" a Minority Assistance Program, but does not state when the program was implemented. It appears from the context that the program had been in existence prior to the adoption of the Act. (See Orange affidavit, p. 2). The Intervenors concede that the purpose of the Minority Assistance Program was "to provide information about doing business

with the state which minority businesses could review."

**15.** The Tenth Circuit has recognized that racially neutral programs designed to assist *all* new or financially disadvantaged businesses in obtaining government contracts tend to benefit minority-owned businesses, and can help alleviate the effects of past and present-day discrimination. *Adarand VII.*

The Intervenors have offered evidence of post-enactment efforts by the State to increase minority participation in State contracting. The Intervenors have presented the annual reports for the "Minority Business Assistance Program" for fiscal years 1991 through 1999. These reports indicate that during those years, *after* the effective date of the Act, state officials made affirmative efforts to increase the participation of minority-owned businesses in the State's competitive bidding process. Furthermore, most of these efforts are admittedly directed toward encouraging the participation of certified minority business enterprises, and are thus not racially neutral.[16] This evidence fails to demonstrate that the State employed race-neutral alternative measures prior to or after adopting the Minority Business Enterprise Assistance Act. *See Adarand VII, supra.*

██ *Durational Limits and Flexibility.* The Defendants argue that the Act is both flexible and limited in duration because of its "self-executing" or "self-adjusting" mechanism. According to Title 74 Okla. Stat. § 85.45(c)(B)(2), the State Purchasing Director is required to certify annually the percentage of state contracting funds which have been expended on contracts awarded to certified minority business enterprises. When minority contractor participation reaches the goal of ten percent, the bidding preference is to be gradually reduced from the current five percent. The bid preference percentage is to be restored to five percent if minority contractor participation falls below the minimum of ten percent.

The Intervenors point out that the Act's ten percent goal is just that—a goal, rather than a rigid quota. However, it is undisputed that the "goal" of ten percent of the state's contracts being awarded to certified minority business enterprises has never been reached, or even approached, during the thirteen years since the Act was implemented, despite the bidding advantage. The Defendants offer no evidence that the bid preference is likely to end at any time in the foreseeable future, or that it is otherwise limited in its duration. Unlike the federal programs at issue in *Adarand VII*, the Oklahoma Act has no inherent time limit, and no provision for disadvantaged minority-owned businesses to "graduate" from preference eligibility. *See Adarand VII*, 228 F.3d 1147, 1179. Indeed, the Oklahoma Act is not limited to those minority-owned businesses which are shown to be economically disadvantaged.

More troubling is the fact that the Act makes no attempt to address or remedy any actual, demonstrated past or present racial discrimination, and that the Act's duration is not tied in any way to the eradication of such discrimination. Instead, the Act rests on the questionable assumption that ten percent of all state contract dollars should be awarded to certified minority-owned and operated businesses, without any showing that this assumption is reasonable. *City of Richmond v. J.A. Croson Company*, 488 U.S. 469, 109

---

**16.** According to the annual reports submitted by the Intervenors, staff members mailed vendor registration forms to minority vendors whose registration had lapsed; telephoned and mailed letters to minority vendors whose registration had lapsed; provided assistance to vendors in completing registration forms; assured that vendors received bid information for their various products and services; prepared a minority business directory and dis-tributed it to all state agencies as well as municipalities and private businesses; periodically mailed construction project information to minority vendors; participated in various purchasing workshops and seminars; provided commodity information to minority vendors upon request; and provided information concerning the availability of commercial loans for small businesses seeking financial assistance.

S.Ct. 706, 102 L.Ed.2d 854 (1989) (30% minority quota "cannot be said to be narrowly tailored to any goal, except perhaps outright racial balancing [because it] rests upon the 'completely unrealistic' assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local population."), *quoting Local 28 of Sheet Metal Workers' Int'l Association v. Equal Employment Opportunity Commission,* 478 U.S. 421, 494, 106 S.Ct. 3019, 3059, 92 L.Ed.2d 344 (1986).[17] By its terms, the Act's minority preference provisions will continue in place for five years after the goal of ten percent minority participation is reached. The Court concludes, accordingly, that the Act's minority preference provisions lack reasonable durational limits.

The Intervenors further argue that the Act is inherently flexible because it contains a "waiver" provision. The Intervenors cite Section 85.45(d) of the Act, which provides that in the event the state purchasing director is "unable" to award a contract pursuant to the minority preference provisions, the contract may be awarded pursuant to the "normal competitive bid and award provisions." This Section does nothing more than allow the State Purchasing Director to award a contract under normal competitive bidding provisions if no certified minority business enterprise, using the 5% bid advantage, has submitted the lowest bid. The Court does not read this "waiver" Section as lending any flexibility to the Act's minority preference provisions.

The State argues that the Act is "limited" in the sense that its bid preference is available only to those businesses owned by minority individuals who are lawful residents of the State of Oklahoma. 74 Okla. Stat. § 85.45b. The Court agrees that this provision limits the number of minority businesses entitled to the bidding preference to those most likely to have suffered from past or present racial discrimination within the State of Oklahoma, but it must be pointed out that this provision has the simultaneous effect of prolonging the life of the bidding preference. To the extent that the provision limits the pool of businesses eligible for minority certification, it extends the time when the bidding preferences are eliminated.[18] As a practical matter, it appears very likely that the bidding preference will continue for many years to come.

The State attempts to show that the Act is flexible, citing Oklahoma cases including *Rollings Construction. Inc. v. Tulsa Metropolitan Water Authority,* 745 P.2d 1176 (Okla.1987) for the proposition that state contracts are not always awarded to the lowest bidder. In *Rollings Construction,* the Supreme Court of Oklahoma held that it was permissible for a municipal water authority to award a contract to the second-lowest bidder where the authority articulated its knowledge of the low bidder's late performance and cost overruns on

**17.** The evidence offered by the Intervenors reflects that approximately four to five percent of the contractors registered with Central Purchasing have been certified minority contractors during the fiscal years 1991 through 1999. It appears from the Intervenors' evidence that the percentage of state contracting dollars awarded to certified minority business enterprises ranged from 4.3 percent in fiscal year 1990 to just under one percent in fiscal year 1999.

**18.** The Plaintiffs' evidence indicates that of approximately 13,000 minority-owned businesses in Oklahoma, just over 200 have obtained the necessary certification under the Act. See 1998 Department of Central Services Annual Report: Affidavit of George R. La-None. With so few minority-owned business seeking and obtaining certification, it appears unlikely that the total contract dollars awarded to those firms will reach or approach ten percent at any time in the foreseeable future.

previous contracts. *See also Hannan v. Board of Education,* 25 Okla. 372, 107 P. 646, 654 (1909); *Flynn Construction Co. v. Leininger,* 125 Okla. 197, 257 P. 374 (Okla. 1927). These cases establish that the State Purchasing Director has the legal authority, under Oklahoma's competitive bidding laws, to bypass the lowest bidder in favor of a better qualified or more responsible contractor if sufficient reason is articulated. To that extent, the Act theoretically incorporates some degree of flexibility. However, the Defendants offer no statistical or anecdotal evidence that the State Purchasing Director has ever used this legal authority to bypass a certified minority bidder. Accordingly, the Defendants have not shown that the Purchasing Director's theoretical ability to bypass a low bidder imparts a substantial degree of flexibility into the Act, as described in *Adarand, supra.*[19]

█ *Numerical Proportionality.* The Court next considers the factor of numerical proportionality between the Act's aspirational goal and the number of existing or potentially available minority-owned businesses. The Act provides for its minority bidding preference to continue until the amount of state funds expended on contracts awarded to certified minority business enterprises equals a minimum of ten percent of the total funds expended on state contracts. The Act makes no attempt to distinguish between the four minority racial groups, so that contracts awarded to members of all of the preferred races are aggregated in determining whether the ten percent aspirational goal has been reached. Likewise, the Act aggregates all state contracts for goods and services, so that minority participation is determined by the total number of dollars spent on state contracts.

In *Adarand VII,* the court rejected the contention that the aspirational goals were required to correspond to an actual finding as to the number of existing minority-owned businesses. The government submitted evidence in that case that the effects of past discrimination had excluded minorities from entering the construction industry, and that the number of available minority subcontractors reflected that discrimination. In light of this evidence, the Tenth Circuit held that the existing percentage of minority-owned businesses is "not necessarily an absolute cap" on the percentage that a remedial program might legitimately seek to achieve. *Adarand VII,* 228 F.3d at 1181 ("Absolute proportionality to overall demographics is an unreasonable goal.").

The Intervenors have offered the affidavit of Jessie Orange which recites that minority racial groups were "systematically and discriminatorily excluded from being allowed to do business with the State of Oklahoma." This evidence is conclusory in nature, and falls far below the level of proof tendered in *Adarand VII.* Unlike *Adarand VII,* the Defendants here have not offered "substantial evidence" that the minorities given preferential treatment under the Act were prevented, through past discrimination, from entering any particular industry, or that the number of available minority subcontractors in that industry reflects that discrimination. Nor have the Defendants offered any evidence of the

---

19. The State asserts that the Act affords minority contractors an advantage only in the area of determining which bid is lowest; and that "the responsibility of the vendor or contractor and the vendor's or contractor's ability to meet the bid's specifications are equally important in the decision of awarding contracts." (State's brief, p. 15). The State of-

fers no evidence in support of this contention. To the contrary, it appears from the evidence of record that in ordinary circumstances if a certified minority firm's bid is within five percent of the lowest non-minority firm's bid, the minority firm will be awarded the contract. (Affidavit of George R. Lanoue. p. 5. Exhibit to Plaintiffs' reply brief).

number of minority-owned businesses doing business in any of the many industries covered by the Act. In summary, the Act's ten percent goal is not based upon demonstrable evidence of the availability of minority contractors who are either qualified to bid or who are ready, willing and able to become qualified to bid on state contracts. Accordingly, the Court finds that the factor of numerical proportionality weighs against a finding that the Act is narrowly tailored.

■ *Impact on Third Parties.* The Court next considers the factor of the Act's impact upon third parties. As the Tenth Circuit stated in *Adarand VII,* the mere possibility that innocent parties will share the burden of a remedial program is itself insufficient to warrant the conclusion that the program is not narrowly tailored. The Act's bid preference provisions prevent non-minority businesses, including the Plaintiffs, from competing on an equal basis with certified minority business enterprises. The Plaintiffs allege, and the Defendants do not dispute, that in some instances they have been required to lower their intended bids because they knew minority firms were bidding. In addition, the taxpayers of Oklahoma presumably pay higher prices for state goods and services each time a contract is awarded to a

higher-bidding minority vendor under the bid preference. Moreover, the five percent preference is applicable to *all* contracts awarded under the state's Central Purchasing Act with no time limitation. *See United States v. Paradise,* 480 U.S. 149, 182—183, 107 S.Ct. 1053, 1072—1073, 94 L.Ed.2d 203 (1987) (Holding that a one-for-one minority promotion provision did not unduly burden third parties because it was "so limited in scope and duration," and only postponed the promotions of qualified whites.).

■ *Under- and Over–Inclusiveness.* Finally, the Court considers the factor of over- and under-inclusiveness of the Act's minority preference provisions. In that regard, the Court first observes that the Act broadly extends its bidding preference to several racial minority groups, *i.e.,* African Americans, Hispanics, Asian Americans, American Indians and Alaskan Natives, without regard to whether each of those groups has suffered from the effects of past or present racial discrimination.[20] As outlined above, the Defendants have offered no evidence that all of the minority racial groups identified in the Act have actually suffered from such discrimination. *Adarand VII, supra; Croson,* 488 U.S. at 508, 109 S.Ct. 706, 102 L.Ed.2d 854.[21] Second, the Act's bidding preference extends

20. Although the statutory definition of "minority" is generously broad, persons of Middle Eastern descent are apparently excluded from the statutory definition, and are not afforded the preference. The parties offer no explanation for this omission.

21. The Intervenors present the affidavit of Jessie Orange, who identifies himself as African American. First, Mr. Orange avers that in the 1980's, the Minority Contractors Association, which consisted primarily of African American-owned construction companies, received statistics from the state which revealed that no African American construction company had received a construction contract from the state. Second, Mr. Orange states

that evidence was presented to the Oklahoma Legislative Black Caucus "demonstrating that minorit[y] contractors had been systematically and discriminatorily excluded from being allowed to do business with the State of Oklahoma." Although the latter statement's reference to "minorities" suggests that more than one racial group was discriminated against, the statement is both conclusory and vague. Other than this, the Defendants have offered no evidence of historical discrimination against Hispanics (defined as persons of Mexican, Puerto Rican, Cuban, Central or South American descent), Asian Americans (defined as persons of Far Eastern, Southeast Asian, Indian, or Pacific Island descent), American Indian or Alaskan Natives.

to all contracts for goods and services awarded under the state's Central Purchasing Act, without regard to whether members of the preferred minority groups have been the victims of past or present discrimination within that particular industry or trade. Third, the preference extends to all business certified as minority owned and controlled, without regard to whether a particular business is economically or socially disadvantaged, or has suffered from the effects of past or present discrimination. The Court finds that the factor of over-inclusiveness weighs against a finding that the Act is narrowly tailored.

The State argues that both *Adarand VII* and *Croson* are distinguishable because they involve "set-aside" programs requiring a certain percentage of contract dollars to be awarded to minorities. To the contrary, although *Croson* struck down, under strict scrutiny analysis, a municipal plan under which prime contractors were required to subcontract a certain percentage of the contract price to one or more minority businesses, *Adarand VII* involved a voluntary subsidy program. *Adarand VII*, 228 F.3d 1147 ("The programs at issue here would almost certainly pass muster under the *Fullilove* standard because, in furtherance of substantially similar goals, the programs before us impose a significantly more flexible and less intrusive remedy—a voluntary subsidy as opposed

to a fixed set-aside subject to waiver."). 228 F.3d at 1162. The ten-percent goal in *Adarand VII* was, like the one at issue here, an aspirational goal, and not a strict set aside. It is clear from prevailing case law, including *Adarand*, that whether an affirmative action program imposes rigid set-asides goes to the issue of "flexibility," and is merely one factor to be considered in the narrow-tailoring analysis.

C. *Severability and Partial Validity of the Act.*

■■ Citing *Ethics Commission of the State of Oklahoma v. Cullison,* 850 P.2d 1069, 1077 (Okla.1993) and Title 75 Okla. Stat. § 11 a(2),[22] the Intervenors argue that the valid provisions of the Act are presumed to be severable from those provisions which are held to be unconstitutional. The Intervenors argue that if the Court finds the Act to be overbroad in extending the bidding preference to minorities of Hispanic or Asian American descent, it should nevertheless uphold the Act with respect to the remaining minorities. (Intervenors' brief, p. 22).

As explained above, the State has not articulated a compelling state goal in support of the Act, i.e., the State does not contend that the Act was adopted to remedy known past or present-day discrimination in state contracting against the favored racial groups.[23] Nor have the State

---

**22.** 75 Okla. Stat. § 11 a(2) provides:

"For acts enacted prior to July 1, 1989, whether or not such acts were enacted with an express provision for severability, it is the intent of the Oklahoma Legislature that the act or any portion of the act or application of the act shall be severable unless:

a. The construction of the provisions or application of I be at would be inconsistent wit the manifest intent of the Legislature;

b. The court finds the valid provisions of the Act are so essentially and inseparably connected with and so dependent upon the void provisions that the court cannot

presume the Legislature would have enacted the remaining valid provisions without the void one; or

c. The court finds the remaining void provisions standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent."

**23.** Instead, the State concedes that the Act was enacted to "promote the economy of the state and to ensure that minority business enterprises are given an opportunity to compete for state contracts," and that the bid preference "was not based on past discrimination." (State's brief, p. 17). See also Title 74 Okla. Stat. § 45f Expressing the Legisla-

or the Intervenors offered evidence sufficient to demonstrate that the Act was adopted for that purpose. Moreover, even if the Court found a compelling state goal in favor of the Act, the Defendants have not shown that the Act is sufficiently narrowly tailored to serve that goal. Severing the Act to restrict its definition of "minority" would not cure the constitutional infirmities of the Act.

■ Finally, the State argues, in the alternative, that strict scrutiny analysis does not apply to preferences extended to Native Americans. The State cites cases in which courts have upheld special legislation designed to fulfill Congress' unique obligation toward the Indian tribes by furthering tribal self-government. *See Morton v. Mancari,* 417 U.S. 535, 555, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) (The employment preference for Indians in the Bureau of Indian Affairs was not impliedly repealed by the Equal Employment Opportunities Act of 1972, and that the preference did not constitute invidious racial discrimination but was reasonable and rationally designed to further Indian self-government); *Rice v. Cayetano,* 528 U.S. 495, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000) (Congress may fulfill its treaty obligations and its responsibilities to the Indian tribes by enacting legislation dedicated to their circumstances and needs. However, Congress may not authorize a state to establish a voting scheme that limits the electorate for its public officials to a class of tribal Indians, to the exclusion of all non-Indian citizens); *Williams v. Babbitt,* 115 F.3d 657, 665 (9th Cir.1997)(Recognizing that each of the cases cited in *Mancari* as permitting special treatment of Indians "dealt with life in the immediate vicinity of Indian land."),

*cert. denied sub nom., Kawerak Reindeer Herders Ass'n v. Williams,* 523 U.S. 1117, 118 S.Ct. 1795, 140 L.Ed.2d 936 (1998). Thus, strict scrutiny applies to the Act even so far as it awards a bidding preference to American Indians. *See, e. g., Tafoya v. City of Albuquerque,* 751 F.Supp. 1527, 1530—1531 (Applying strict scrutiny to preference for Indian vendors in vending licenses).

### IV. *Conclusion.*

The Court finds, for the reasons expressed above, that the Oklahoma Minority Business Enterprise Assistance Act violates the Fifth Amendment guarantee of equal protection. To that extent, the Plaintiffs' Motion for Summary Judgment is hereby GRANTED. The Court reserves for later consideration all issues pertaining to remedies.

---

ture's intent to "ensure that minority business enterprises are not underrepresented in the area of procurement of state contracts for construction, services, equipment and goods,"

and to "provide for the aggressive solicitation of minority business enterprises." Title 74 Okla. Stat. § 45f.