In the
United States Court of Appeals
For the Seventh Circuit

Nos. 00-4161 and 00-4175

Builders Association of Greater Chicago,

Plaintiff-Appellee,

v.

County of Cook,

Defendant-Appellant,

and

Association of Asian Construction Enterprises,
et al.,

Intervening-Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 96 C 1121--John F. Grady, Judge.

Argued May 10, 2001--Decided July 6, 2001

   Before Posner, Easterbrook, and Diane P.
Wood, Circuit Judges.

   Posner, Circuit Judge.  In 1988 Cook
County adopted an ordinance, here
challenged as a denial of equal
protection of the laws, establishing a
"Minority- and Women-Owned Business
Enterprise Program" (the "M/WBE" program,
the parties call it), which requires that
a minimum of 30 percent of the total
value of any construction contract made
by the County be awarded to enterprises
at least 51 percent owned by members of
specified minority groups such as blacks
and Hispanics, and a minimum of 10
percent of the value of the contract to
enterprises at least 51 percent owned by
women. These quotas can be, and usually
are, satisfied by the hiring of minority-
or woman-owned subcontractors by prime
contractors that are not themselves
minority- or woman-owned. After a bench
trial, the district court ruled that the
program was unconstitutional, 123 F.Supp.
2d 1087 (N.D. Ill. 2000), and the County
appeals.

A law that grants preferential treatment on the basis of race or ethnicity does not deny the equal protection of the laws if it is (1) a remedy for (2) intentional discrimination committed by (3) the public entity that is according the preferential treatment (unless, as is not argued here, the entity has been given responsibility by the state for enforcing state or local laws against private discrimination, City of Richmond v. J.A. Croson Co., 488 U.S. 469, 491-92 (1989) (plurality opinion)) and (4) discriminates no more than is necessary to accomplish the remedial purpose. E.g., Shaw v. Hunt, 517 U.S. 899, 909-10 (1996); Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 224, 235, 237-38 (1995); Wygant v. Jackson Board of Education, 476 U.S. 267, 277 (1987) (plurality opinion); Chicago Firefighters Local 2 v. City of Chicago, 249 F.3d 649, 654-655 (7th Cir. 2001); Billish v. City of Chicago, 989 F.2d 890, 893 (7th Cir. 1993) (en banc); Associated General Contractors of Ohio, Inc. v. Drabik, 214 F.3d 730, 735 (6th Cir. 2000). Whether nonremedial justifications for "reverse discrimination" by a public body are ever possible is unsettled. Hill v. Ross, 183 F.3d 586, 588 (7th Cir. 1999); McNamara v. City of Chicago, 138 F.3d 1219, 1222 (7th Cir. 1998); Brewer v. West Irondequoit Central School Dist., 212 F.3d 738, 747-49 (2d Cir. 2000); Wessmann v. Gittens, 160 F.3d 790, 795 (1st Cir. 1998). This court upheld such a justification in Wittmer v. Peters, 87 F.3d 916 (7th Cir. 1996), but the Fifth Circuit has stated flatly that "non-remedial state interests will never justify racial classifications." Hopwood v. Texas, 78 F.3d 931, 942 (5th Cir. 1996). The Supreme Court will have to decide the question eventually (maybe it will do so next term in the Slater case, cited below, in which certiorari has been granted), but it is of no moment here, because the County has not advanced any nonremedial justification for the minority set-aside program.

Another unresolved issue is whether a different, and specifically a more permissive, standard is applicable to preferential treatment on the basis of sex rather than race or ethnicity. See Milwaukee County Pavers Ass'n v. Fiedler, 922 F.2d 419, 422 (7th Cir. 1991). The Eleventh Circuit held in Engineering

Contractors Ass'n of South Florida Inc. v. Metropolitan Dade County, 122 F.3d 895, 910 (11th Cir. 1997), that whereas a discriminatory remedy based on race or ethnicity is permissible only if the agency applying the remedy itself engaged in intentional discrimination against the group favored by the remedy (unless, to repeat an earlier qualification, the agency is a law enforcement agency charged with eliminating private discrimination), a discriminatory remedy based on sex is permissible even if the agency was innocent of the discrimination against the favored group. The decision is an effort to make sense of the fact that the Supreme Court has so far held racial discrimination to a stricter standard than sex discrimination, e.g., United States v. Virginia, 518 U.S. 515, 532 and n. 6 (1996); Craig v. Boren, 429 U.S. 190, 197-98 (1976), though the difference between the applicable standards has become vanishingly small. As the Court said in the VMI case, "parties who seek to defend gender-based government action must demonstrate an'exceedingly persuasive' justification for that action," United States v. Virginia, supra, 518 U.S. at 533, and, realistically, the law can ask no more of race-based remedies either. Engineering Contractors Ass'n creates the paradox that a public agency can provide stronger remedies for sex discrimination than for race discrimination; it is difficult to see what sense that makes. But since here, as in Milwaukee County Pavers, the County doesn't argue for a different standard for the minority and women's set-aside programs, the women's program must clear the same four hurdles as the minority program. Neither clears any of them.

There is, to begin with, no credible evidence that Cook County in the award of construction contracts ever intentionally (or for that matter unintentionally) discriminated against any of the groups favored by the program. See Associated General Contractors of Ohio, Inc. v. Drabik, supra, 214 F.3d at 735-37. The County points to evidence that prime contractors are more likely to solicit minority subcontractors to bid for pieces of public jobs than for pieces of private jobs. It calls the difference discriminatory and asks us to infer that until the enactment of the ordinance

there must have been discrimination against minority contractors. But that is a non sequitur. Since the ordinance requires prime contractors on public projects to reserve a substantial portion of the subcontracts for minority contractors, but is inapplicable to private projects, it is only to be expected that there would be more soliciting of these contractors on public than on private projects. The alleged discrimination is an artifact of the ordinance.

As the district court noted, moreover, the County "conceded that [it] had no specific evidence of pre-enactment discrimination to support the ordinance." 123 F. Supp. 2d at 1093. Although there was some testimony of minority subcontractors that they had suffered discrimination earlier, it was introduced only to show (see id.) that the later evidence was persuasive. A public agency must have a strong evidentiary basis for thinking a discriminatory remedy appropriate before it adopts the remedy. Shaw v. Hunt, supra, 517 U.S at 909-10; Coral Construction Co. v. King County, 941 F.2d 910, 920 (9th Cir. 1991); cf. Concrete Works of Colorado, Inc. v. City & County of Denver, 36 F.3d 1513, 1521 (10th Cir. 1994). A further point is that private projects in Cook County are on average smaller than public ones, so fewer subcontractors are required, so there is less need to solicit them. Minority enterprises in the construction industry tend to be subcontractors, moreover, because, as the district judge found not clearly erroneously, 123 F. Supp. 2d at 1115, they tend to be new and therefore small and relatively untested-- factors not shown to be attributable to discrimination by the County.

Nor is there any basis for attributing to the County any discrimination that prime contractors may have engaged in. The County reminds us of the suggestion in Croson that a state or local government might be permitted to adopt a discriminatory remedy if it had been a "passive participant" in the private discrimination against which the remedy is directed. City of Richmond v. J.A. Croson Co., supra, 488 U.S. at 492 (plurality opinion); see also Adarand Constructors, Inc. v. Slater, 228 F.3d 1147, 1167, 1175 (10th Cir. 2000), cert.

granted, 121 S. Ct. 1401 (2001); Associated General Contractors of Ohio, Inc. v. Drabik, supra, 214 F.3d at 735. If prime contractors on County projects were discriminating against minorities and this was known to the County, whose funding of the contracts thus knowingly perpetuated the discrimination, the County might be deemed sufficiently complicit (a kind of joint tortfeasor, coconspirator, or aider and abettor) to be entitled to take remedial action. But of that there is no evidence either. See Contractors Ass'n of Eastern Pennsylvania, Inc. v. City of Philadelphia, 91 F.3d 586, 601 (3d Cir. 1996); Concrete Works of Colorado, Inc. v. City & County of Denver, supra, 36 F.3d at 1529-30.

And if the County had been complicit in discrimination by prime contractors, still it would be odd to try to remedy that discrimination by requiring discrimination in favor of minority stockholders, as distinct from employees. That is a standard feature of minority set-aside programs, but a puzzling one in terms of the stated objectives of such programs. There may have been a time when prime contractors in parts of Cook County were unlikely to award subcontracts to firms whose workforce was black, Hispanic, or female, but if so it is doubtful that these prime contractors would have known what the ownership structure of the subcontractors was. If there was prejudice against minority workers, minority-owned firms could beat it by salting their workforces with the number of white males demanded by bigoted prime contractors.

Even if the record made a case for remedial action of the general sort found in the ordinance, it would flunk the con stitutional test by not being carefully designed to achieve the ostensible remedial aim and no more. A state or local government that has discriminated just against blacks may not by way of remedy discriminate in favor of blacks and Asian-Americans and women. City of Richmond v. J.A. Croson Co., supra, 488 U.S. at 506; Associated General Contractors of Ohio, Inc. v. Drabik, supra, 214 F.3d at 737; Monterey Mechanical Co. v. Wilson, 125 F.3d 702, 714-15 (9th Cir. 1997). Nor may it discriminate more than is necessary to

cure the effects of the earlier discrimination. Majeske v. City of Chicago, 218 F.3d 816, 820, 823 (7th Cir. 2000); McNamara v. City of Chicago, supra, 138 F.3d at 1222-23. Nor may it continue the remedy in force indefinitely, with no effort to determine whether, the remedial purpose attained, continued enforcement of the remedy would be a gratuitous discrimination against nonminority persons. Chicago Firefighters Local 2 v. City of Chicago, supra, 249 F.3d at 654-55; Danskine v. Miami Dade Fire Dept., 2001 WL 649502, at *12-13 (11th Cir. June 12, 2001); Boston Police Superior Officers Federation v. City of Boston, 147 F.3d 13, 24-25 (1st Cir. 1998); Middleton v. City of Flint, 92 F.3d 396, 411-12 (6th Cir. 1996). All three points are closely related (the second and third particularly so, as we'll see). They amount to a requirement of a close match between the evil against which the remedy is directed and the terms of the remedy. As the cases say, the remedy must be "narrowly tailored" to the wrong that it seeks to correct.

The County's briefs in this court do not mention the "narrow tailoring" issue, even though the requirement of narrow tailoring is an independent one that must be satisfied for a minority set-aside program to withstand constitutional challenge and even though the district court found that it had not been satisfied. The plaintiff pointed this out in its brief and argued that we could affirm on the basis of the County's forfeiture. Arsberry v. Illinois, 244 F.3d 558, 563 (7th Cir. 2001); Georgou v. Fritzshall, 178 F.3d 453, 456-57 (7th Cir. 1999); Charter Oil Co. v. American Employers' Ins. Co., 69 F.3d 1160, 1170-71 (D.C. Cir. 1995). The argument appears in the plaintiff's summary of argument as one of twelve alternative arguments for affirmance, and is not actually made until page 40 of its brief, and then with extreme brevity. The plaintiff's apparent lack of complete conviction that forfeiture is an adequate basis for affirmance may reflect an uncertainty arising from a persistent theme in the County's briefs, which is that if it can prove that there was discrimination in the past against minorities and women that it is entitled to remedy the burden then shifts to the plaintiff to show that the remedy is not narrowly tailored. The

plaintiff has not accepted this argument, but it has devoted a significant portion of its brief to arguing that, in fact, the remedy is not narrowly tailored. We cannot find any merit in the County's burden-shifting argument or any support for it in the case law, but in the rather confused circumstances we hesitate to rest our decision on forfeiture, especially as it is perfectly clear, regardless of the allocation of the burden of proof (which can of course be decisive only in a close case), not only that the County has failed to establish the premise for a racial remedy but also that the remedy goes further than is necessary to eliminate the evil against which it is directed.

   The County's laundry list of favored minorities includes two groups--persons whose ancestors came to the United States from Spain or Portugal--that common sense (not contradicted by any evidence) instructs have never been subject to significant discrimination by Cook County. Even if "Hispanic," the root of which is the Spanish word for Spain, can be stretched to include people of Portuguese origin (most Brazilians, for example), the concern with discrimination on the basis of Hispanic ethnicity is limited to discrimination against people of South or Central American origin, who often are racially distinct from persons of direct European origin because their ancestors include blacks or Indians or both; of course they may instead or as well be ethnically distinct on the basis of culture or language. The concern with racial discrimination does not extend to Spanish or Portuguese people, or the concern with ethnic discrimination to persons of Spanish or Portuguese ancestry born in the United States; but even as to those born abroad, there is nothing to differentiate immigrants from Spain or Portugal from immigrants from Italy, Greece, or other southern European countries so far as a history of discrimination in the United States is concerned. See Peightal v. Metropolitan Dade County, 26 F.3d 1545, 1559-61 (11th Cir. 1994); cf. City of Richmond v. J.A. Croson Co., supra, 488 U.S. at 506 (plurality opinion); Associated General Contractors of Ohio, Inc. v. Drabik, supra, 214 F.3d at 737; Monterey Mechanical Co. v. Wilson, supra, 125 F.3d at 714-15. Anyone of recent foreign origin might be able to demonstrate that

he or she was a victim of ethnic discrimination, but to presume such discrimination merely on the basis of having an ancestor who had been born in the Iberian peninsula is unreasonable.

   So the ordinance is overinclusive. Nor has the County made any effort to show that, were it not for a history of discrimination, minorities would have 30 percent, and women 10 percent, of County construction contracts. If a state or local government had in consequence of its former discrimination limited the percentage of minority contractors on public projects to 10 percent, and in the absence of discrimination the percentage would have been 20 percent, the government could not, by way of remedy, establish a minority quota of 50 percent. At least it could not do that indefinitely, so that long after the minorities had caught up, their percentage of contracts would continue to swell, until they ended up with two and a half times (50 percent divided by 20 percent) more contracts than they would have had if the government had never discriminated against them. Chicago Firefighters Local 2 v. City of Chicago, supra, 249 F.3d at 655.

   We recur in this hypothetical to one of the most dubious propositions advanced by the County in this case--that a comparison of the fraction of minority subcontractors on public and private projects established discrimination against minorities by prime contractors on the latter type of project. The larger the quota imposed on prime contractors on hiring subcontractors for public projects, the smaller will be the percentage of subcontractors hired for private projects even if there is no discrimination by prime contractors, simply because the quota will have drawn minority subcontractors into the public projects and driven majority subcontractors out of those projects and into the private ones.

Affirmed.